IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

RAY HUNTER,

            **Plaintiff,**

v.                                      1:12-cv-1440-WSD

D.G. SCHOEPPNER,

            **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment [22].

**I.   BACKGROUND**

    A.   <u>Procedural History</u>

On April 25, 2012, Plaintiff Ray Hunter ("Plaintiff") filed this civil rights action against Defendant D.G. Schoeppner ("Defendant"), a detective with the DeKalb County Police Department. This action arises from Plaintiff's arrest in September 2008 for bank robbery. In his Complaint [1], Plaintiff asserts causes of action under 42 U.S.C. § 1983 for malicious prosecution in violation of the Fourth Amendment (Count I) and under state law for false arrest (Count II) and malicious prosecution (Count III).

On November 20, 2012, after discovery was completed, Defendant filed his Motion for Summary Judgment on the grounds that he had probable cause to arrest Plaintiff and that he has qualified immunity from this action based on the arrest. Plaintiff responds that Defendant lacked probable cause for the arrest and that Defendant is not entitled to qualified immunity. Plaintiff did not oppose, or otherwise respond to, Defendant's request for summary judgment on Plaintiff's state law claims.

B.   Facts[1]

On November 17, 2006, the Emory Federal Credit Union ("Emory FCU") in DeKalb County was robbed. (Def.'s SUMF [22-2] ¶ 2; Pl.'s SAMF [38] ¶ 15.) The suspect, described as a 5'11" black male between the ages of 40 and 50 and weighing 200 pounds, gave a teller a note, written on a Bank of America check. (Def.'s SUMF [22-2] ¶ 2; Pl.'s SAMF [38] ¶ 15.) The note stated that the suspect had explosives, and it demanded $35,000. (Def.'s SUMF [22-2] ¶ 2; Pl.'s SAMF [38] ¶ 15.) The suspect showed the teller that he had a "device" with a red light. (Def.'s SUMF [22-2] ¶ 2; Pl.'s SAMF [38] ¶ 16.) The teller gave the suspect

---

[1] These facts are take from Defendant's Statement of Undisputed Material Facts [22-2] ("Defendant's SUMF") and Plaintiff's Statement of Additional Material Facts [38] ("Plaintiff's SAMF"), along with their accompanying exhibits, submitted in accordance with Local Civil Rule 56.1. Unless otherwise indicated, the facts are undisputed.

$14,000.  (Def.'s SUMF [22-2] ¶ 2; Pl.'s SAMF [38] ¶ 17.)  The suspect took back the note and left.  (Def.'s SUMF [22-2] ¶ 2.)

Defendant, a detective in the Major Felony Unit of the DeKalb County Police Department, investigated the Emory FCU robbery.  (See Def.'s SUMF [22-2] ¶¶ 1–2.)  On January 3, 2007, Defendant attended an FBI-sponsored meeting of Atlanta area police officials to discuss bank robberies throughout the region.  (Pl.'s SAMF [38] ¶ 25.)  At the meeting, Defendant learned that City of Atlanta police were investigating two robberies that were similar to the Emory FCU robbery.  (Id. ¶ 26.)  On December 14, 2006, a suspect described as a 6'0", 45-year-old black male weighing 200 pounds, had robbed a SunTrust Bank in Atlanta by showing a teller a "device" with flashing lights and giving the teller a note, written on a Bank of America check, warning of explosives and demanding $35,000.  (Id. ¶¶ 64–66.)  The suspect escaped with cash and the note.  (Id. ¶ 67.)  On December 22, 2006, a male suspect attempted to rob a Wachovia Bank in Atlanta with a note, written on a Bank of America check, warning of explosives and demanding $35,000.  (Id. ¶¶ 68–69.)  The suspect was not given any bank funds, and he walked out of the bank, leaving the note behind.  (Id. ¶ 70.)  The check on which the note was written was recovered by Atlanta police.  (Id. ¶ 72.)  It belonged to Plaintiff.  (Id.)

On January 5, 2007, two days after the FBI-sponsored meeting, an attempted

3

bank robbery, similar to the Emory FCU and Atlanta robberies, occurred at a BB&T branch in DeKalb County. A suspect, described as a 5'11" black male in his late thirties and weighing 200 pounds, handed a teller a note, written on a Bank of America check, stating that the suspect had explosives and demanding $35,000. (Def.'s SUMF [22-2] ¶ 3; Pl.'s SAMF [38] ¶ 19.) The suspect showed the teller a white "device," or "clicker," with a blue button. (Def.'s SUMF [22-2] ¶ 3; Pl.'s SAMF [38] ¶ 20.) The teller called 911, and the suspect fled, leaving the check behind. (Def.'s SUMF [22-2] ¶ 3.) Although the accountholder's name on the check was obscured, the name was visible and read "DBA Mattress & Furniture City Ray Hunter Sole Prop." (Id. ¶ 5.)

After the BB&T robbery in DeKalb, Defendant again spoke with the Atlanta detective investigating the Atlanta bank robberies. (See id. ¶ 6.) Defendant learned that the check recovered from the DeKalb BB&T robbery was for the same account as the check recovered from the Atlanta Wachovia robbery. (Id.) The account belonged to Plaintiff, and the company named on the check had gone out of business. (Id.) The Atlanta detective had shown to witnesses of the Atlanta robberies a photographic lineup which included Plaintiff's photo. (Id.) The witnesses who were shown the lineup were not able to identify the robber. (Id.) The detective sent Defendant a copy of Plaintiff's photo. (Id.)

Defendant personally compared the photo of Plaintiff he received to the surveillance videos of the DeKalb robberies. (Id. ¶ 7.) Although the quality of the surveillance videos was not sufficient to enable a positive identification, Defendant concluded that the suspect in both videos appeared to be the same person, and that the suspect resembled Plaintiff. (Id. ¶¶ 7–8.)

On January 9, 2007, Defendant showed a photographic lineup, including Plaintiff's photo, (the "Hunter lineup") to two witnesses of the BB&T robbery. (Id. ¶ 13; Pl.'s SAMF Ex. B pt. 6 [38-7] at 2, 7.[2]) One witness was unable to make an identification. (Def.'s SUMF [22-2] ¶ 13; Pl.'s SAMF Ex. B pt. 6 [38-7] at 7.) The other witness made a "tentative" identification of Plaintiff.[3] (Def.'s SUMF [22-2] ¶ 13; Pl.'s SAMF Ex. B pt. 6 [38-7] at 2.)

On January 10, 2007, Defendant showed the Hunter lineup to the teller-

---

[2] Pincites are to ECF page numbers.

[3] At the time of these interviews, the DeKalb Police Department had a policy with respect to lineups that allowed a witness to make a "positive" identification, a "tentative" identification, or no identification. (Def.'s SUMF [22-2] ¶ 11.) Witnesses were not given an explanation of what a "tentative" identification required. (Pl.'s SAMF [38] ¶¶ 42, 44.) Defendant testified that he understood a "tentative" identification to mean that the witness is anywhere from "1 percent to 99 percent" confident that the identified photo is of the suspect. (Id. ¶ 43.) Defendant understood that the DeKalb Police Department's policy was that a "tentative" identification alone was not sufficient to support an arrest. (Def.'s SUMF [22-2] ¶ 12; Pl.'s SAMF [38] ¶ 41.)

5

victim of the BB&T robbery, and to a witness to the Emory FCU robbery.  (Def.'s SUMF [22-2] ¶¶ 10, 13; Pl.'s SAMF [38] ¶¶ 39, 52.)  The BB&T victim "tentatively" identified a photograph of a person other than Plaintiff.  (Def.'s SUMF [22-2] ¶ 13; Pl.'s SAMF [38] ¶ 52.)  The Emory FCU witness "tentatively" identified Plaintiff.  (Def.'s SUMF [22-2] ¶ 10; Pl.'s SAMF [38] ¶ 46.)

Based on the similarity of the Emory FCU and BB&T robberies and his comparison of the surveillance videos from both banks, Defendant believed that the same suspect committed both robberies.  (Def.'s SUMF Tab 12 [23] at 49.)  Based on the fact that Plaintiff's check was used for the note in the BB&T robbery, that Defendant personally compared Plaintiff's photo to the surveillance videos and concluded Plaintiff resembled the robber in the surveillance videos, and that two witnesses gave "tentative" identifications of Plaintiff as the bank robber they observed, Defendant believed he had probable cause to arrest Plaintiff for the robberies.  (Id. at 49–50; Pl.'s SAMF [38] ¶ 54.)  On January 10, 2007, Defendant applied for, and a judge of the DeKalb County Magistrate Court issued, arrest warrants for Plaintiff.  (Def.'s SUMF [22-2] ¶ 14; Def.'s SUMF Tab 12 [23] at 49–50; Pl.'s SAMF [38] ¶ 53; Pl.'s SAMF Ex. B pt. 4 [38-5] at 21; Pl.'s SAMF Ex. B pt. 6 [38-7] at 10.)  The warrants were not immediately executed.  (See Pl.'s SAMF [38] ¶ 80.)

On March 10, 2007, Defendant learned that, on March 9, 2007, Atlanta police had arrested Charles Hamlett ("Hamlett") for the Atlanta bank robberies. (Def.'s SUMF [22-2] ¶ 15; Pl.'s SAMF [38] ¶ 78.)  Atlanta police were led to Hamlett after the surveillance video of one of the Atlanta robberies was shown on local television, and a viewer called police to identify Hamlett as the suspect. (Pl.'s SAMF [38] ¶¶ 74–78.)  Atlanta police searched Hamlett's car and found a check stub matching the check that had been used as the note in the Atlanta Wachovia robbery.  (Id. ¶ 79.)  During questioning, Hamlett did not confess to any robberies, but he stated that he knew, and had worked for, Plaintiff.  (Id. ¶ 86; id. Ex. C [38-8] at 5.)

Defendant obtained Hamlett's photo, compared it the surveillance videos of the DeKalb robberies, and concluded that Hamlett's features were similar enough to the robber's that Hamlett could not be eliminated as a suspect. (Def.'s SUMF [22-2] ¶ 16.)  Defendant created a photographic lineup that included Hamlett's photo (the "Hamlett lineup").  (Id. ¶ 17; Pl.'s SAMF [38] ¶ 104.)  On March 28, 2007, Defendant met, for the first time, with the teller-victim of the Emory FCU robbery.  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶ 105.)  She had not previously seen any lineup that had been developed for use in the robbery investigations.  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶ 105.)  He first

7

showed the teller the Hamlett lineup, and she "tentatively" identified a filler photo. (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶ 106.)  He then showed the teller the Hunter lineup, and she "positively" identified Plaintiff as the person who robbed her.  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶ 107.)

On March 30, 2007, Defendant showed the Hamlett lineup to three witnesses who had viewed the Hunter lineup in January: the Emory FCU witness who had "tentatively" identified Plaintiff, the BB&T teller-victim who had identified a filler photo, and a BB&T witness who had not identified anyone.  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶¶ 109, 111–112.)[4]  The Emory FCU witness "tentatively" identified Hamlett from the Hamlett lineup.  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶ 109.)  Neither BB&T witness identified Hamlett as the person who committed the robbery they witnessed.[5]  (Def.'s SUMF [22-2] ¶ 17; Pl.'s SAMF [38] ¶¶ 111–112.)

After showing the lineups to these witnesses and receiving a positive identification from the teller-victim of the Emory FCU robbery, Defendant

---

[4] Defendant did not show the Hunter lineup to the BB&T witness who had previously "tentatively" identified Plaintiff from the Hunter lineup. (Pl.'s SAMF [38] ¶ 110.)

[5] There is nothing in the record showing that any of these witnesses retracted their previous "tentative" identifications from the Hunter lineup. In the Hamlett lineup, they "tentatively" identified persons other than Hamlett.

consulted with a sergeant in his department to discuss their case against Plaintiff. (Def.'s SUMF [22-2] ¶ 19.) Defendant and the sergeant agreed that the evidence supporting Plaintiff's guilt was stronger than when they obtained the arrest warrants for Plaintiff in January 2007, because there now was a positive identification of Plaintiff and two "tentative" identifications of Plaintiff. (Id. ¶¶ 18–19.)[6] Defendant and the sergeant thus decided the January 2007 arrest warrants would be executed because the evidence to support them was now more compelling.

On September 15, 2008, Plaintiff was arrested and charged with the Emory FCU and BB&T robberies. (Compl. [1] ¶ 66; Answer [3] at 4.)[7]

---

[6] In his response to Defendant's SUMF, Plaintiff purports to "deny" the facts asserted in paragraphs 18 and 19 of the SUMF. (See Pl.'s Resp. Def.'s SUMF [37] ¶¶ 18–19.) Plaintiff, however, does not cite any evidence showing that the assertions—regarding Defendant's beliefs as to the strength of the evidence against Plaintiff—are not true. Plaintiff instead argues why the evidence was not sufficient to support probable cause for an arrest. The Court does not consider Plaintiff's legal arguments in the context of evaluating what facts are established in the record, and the Court accepts the factual assertions in paragraphs 18 and 19 of the SUMF as true. See LR 56.1(B)(2).

[7] In April 2010, the charges against Plaintiff were dismissed. (Compl. [81] ¶ 81; Answer [3] at 4.) The decision to dismiss the charges was made by the prosecuting authorities. (Compl. [81] ¶ 81; Answer [3] at 4.)

## II.   DISCUSSION

### A.   Legal Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Parties "asserting that a fact cannot be or is genuinely disputed must support that assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1).

The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). Non-moving parties "need not present evidence in a form necessary for admission at trial; however, [they] may not merely rest on [their] pleadings." Id.

The Court must view all evidence in the light most favorable to the party

opposing the motion and must draw all inferences in favor of the non-movant, but only "to the extent supportable by the record." Garczynski v. Bradshaw, 573 F.3d 1158, 1165 (11th Cir. 2009) (quoting Scott v. Harris, 550 U.S. 372, 381 n.8 (2007)). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

    B.    Analysis

Under 42 U.S.C. § 1983,

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983 (2006). Section 1983 is not a source of substantive rights but rather provides a method for vindicating federal rights conferred by the Constitution and federal statutes. Baker v. McCollan, 443 U.S. 137, 144 n.3

11

(1979).  To prevail in an action under § 1983, a plaintiff must prove two elements: (1) that an act or omission deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States, and (2) that the act or omission was done by a person acting under color of law.  Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist., 992 F.2d 1171, 1174 (11th Cir. 1993); Harvey v. Harvey, 949 F.2d 1127, 1130 (11th Cir. 1992).

Plaintiff here alleges that Defendant, acting under color of law in his capacity as a police officer, had Plaintiff arrested in violation of the Fourth Amendment.  Defendant, who does not dispute that he acted under color of law, argues that his arrest of Plaintiff did not violate the Fourth Amendment because he had probable cause to arrest.

The Fourth Amendment, as it applies to the states and their localities by virtue of the Fourteenth Amendment, protects citizens "against unreasonable searches and seizures" by police officers.  Brown v. City of Huntsville, 608 F.3d 724, 734 n.15 (11th Cir. 2010); see also U.S. Const. amend. IV.  An arrest is a "seizure" under the Fourth Amendment.  Case v. Eslinger, 555 F.3d 1317, 1326 (11th Cir. 2009) (quoting Skop v. City of Atlanta, 485 F.3d 1130, 1137 (11th Cir.2007)).  "The 'reasonableness' of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." Id. (citing Skop,

485 F.3d at 1137). "A warrantless arrest without probable cause violates the Constitution and provides a basis for a section 1983 claim, but the existence of probable cause at the time of arrest constitutes an absolute bar to a section 1983 action for false arrest." Id. at 1326–27 (alterations, omissions, and internal quotation marks omitted) (quoting Kingsland v. City of Miami, 382 F.3d 1220, 1226 (11th Cir. 2004)).

"Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." Id. at 1327 (quoting United States v. Gonzalez, 969 F.2d 999, 1002 (11th Cir.1992)). The record here establishes that Defendant had probable cause to arrest Plaintiff. The facts and circumstances within Defendant's knowledge sufficiently warranted a reasonable belief that Plaintiff had committed one or more bank robberies.[8] The evidence is convincing and undisputed. Plaintiff's check was used for the note in at least one of the two bank robberies (Def.'s SUMF [22-2] ¶ 5); Defendant personally analyzed the surveillance videos and compared them to Plaintiff's photograph to conclude that the robber in the videos resembled Plaintiff (id. ¶ 7); two

---

[8] The Court notes that a neutral and detached Magistrate Judge on January 10, 2007, determined there was probable cause to arrest Plaintiff for the DeKalb County bank robberies.

13

eyewitnesses "tentatively" identified Plaintiff as the person who robbed the bank at which they were present (id. ¶¶ 10, 13); and a teller to whom a robbery note was presented and who had a face-to-face encounter with the person who robbed her bank, "positively" identified Plaintiff as the person who robbed her bank branch (id. ¶ 17; Pl.'s Ex. B pt. 4 [38-5] at 4).[9]  The facts and circumstances indisputably support that Defendant believed that Plaintiff had committed the bank robberies, that this belief was more than reasonable, and that Defendant had probable cause to arrest Plaintiff.  See, e.g., United States v. Dumonde, 190 F. App'x 788, 790 (11th Cir. 2006) (per curiam) (finding probable cause for arrest where phone calls originated from suspect's home and eyewitness identified suspect from a photographic lineup).

---

[9] The Court notes that Defendant obtained warrants for Plaintiff before Plaintiff was arrested.  "[A] warrant is the clearest indication that the officers acted in an objectively reasonable manner" and thus generally confers a "shield of immunity" on the arresting officers, unless "it is obvious that no reasonably competent officer would have concluded that a warrant should issue."  Messerschmidt v. Millender, 132 S. Ct. 1235, 1245 (2012) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)) (citing United States v. Leon, 468 U.S. 897, 922–23 (1984)).  The threshold for showing "unreasonableness" in the face of a warrant "is a high one."  Id.  Because Plaintiff's arrest, pursuant to the warrants, occurred after Defendant conducted further investigation, which Plaintiff argues undermined the strength of Defendant's case against Plaintiff, the Court considers the evidence under the more stringent warrantless arrest standard discussed above.  See Kingsland, 382 F.3d 1220, 1229 (holding that a police officer may not ignore evidence available to him before making an arrest).

Plaintiff argues, notwithstanding the facts supporting the arrest of Plaintiff, that Defendant was aware, or should have been aware, of evidence establishing that Hamlett likely committed the DeKalb robberies and that this other information precluded the existence of probable cause. Plaintiff argues that the similarity of the DeKalb and Atlanta robberies support that the robberies were committed by the same person, that this information was available to Defendant before Plaintiff's arrest, that Hamlett was in possession of a stub for Plaintiff's check that matched a check used as a note in one of the Atlanta robberies, and that a witness positively identified Hamlett as the suspect in surveillance videos of the Atlanta robberies.

The Court finds that this evidence connecting Hamlett to the Atlanta robberies is not sufficient to show that Defendant lacked probable cause to arrest Plaintiff for the DeKalb robberies. The evidence collected by the Atlanta police did not directly connect Hamlett to the DeKalb robberies. The check stub found in Hamlett's possession matched only a check used in an Atlanta robbery, and the witness who identified Hamlett had seen the surveillance video of only one of the Atlanta robberies. Plaintiff's argument ignores that the evidence could support that two or more perpetrators, working in concert, were responsible for the various bank robberies, a possibility supported by Defendant's investigation after Hamlett's arrest.

Defendant did not ignore the evidence of Hamlett's involvement in the Atlanta robberies.  Defendant obtained Hamlett's booking photo and created a photographic lineup with it.  He then showed the lineup to four witnesses from the DeKalb robberies, including the teller-victim of the Emory FCU robbery.  Only one of these witnesses "tentatively" identified Hamlett.  The Emory FCU teller-victim, the person who confronted directly the person who robbed her bank, positively identified Plaintiff as the man who had robbed her, and did so after seeing lineups in which Hamlett's and Plaintiff's photos both were presented.[10]  Defendant took the additional step of consulting with another officer, both of whom agreed, based on the positive identification by the teller-victim, that the evidence was strong and convincingly supported there was probable cause to arrest Plaintiff, and that on less developed evidence a Magistrate Judge previously had found probable cause to arrest Plaintiff.  The Court concludes on the facts and circumstances known to Defendant, that Defendant had a reasonable belief that Plaintiff had committed a bank robbery, and that Defendant thus is entitled to

---

[10] Plaintiff argues that the teller-victim's "positive" identification is not trustworthy because she also "tentatively" identified a filler photograph from the Hamlett lineup.  Plaintiff's argument ignores the order in which the teller made her identifications.  She was first shown the Hamlett lineup and made her "tentative" identification.  She then was shown the Hunter lineup and then made a "positive" identification of Plaintiff as the man who had robbed her.

16

summary judgment on Plaintiff's § 1983 claim.[11]

## III.   CONCLUSION

Accordingly, for the foregoing reasons,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment [22] is **GRANTED**.  The Clerk is **DIRECTED** to enter judgment in favor of Defendant on all claims.

**SO ORDERED** this 2nd day of August, 2013.

_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE

---

[11] Plaintiff did not oppose, or otherwise respond to, Defendant's motion for summary judgment on Plaintiff's state law claims for false arrest and malicious prosecution.  The Court concludes that Plaintiff has abandoned his state law claims and that Defendant is entitled to summary judgment on the claims.  See St. Andrews Presbyterian Coll. v. S. Ass'n of Colls. & Sch., 679 F. Supp. 2d 1320, 1334–35 (N.D. Ga. 2009) (citing Bute v. Schuller Int'l, Inc., 998 F. Supp. 1473, 1477 (N.D. Ga. 1998); Welch v. Delta Air Lines, Inc., 978 F. Supp. 1133, 1137 (N.D.Ga.1997)) ("Failure to respond to an opposing party's arguments regarding a claim constitutes abandonment of that claim, and warrants dismissal of the abandoned claim."); see also LR 7.1(B), NDGa ("Failure to file a response shall indicate that there is no opposition to the motion.").  The Court notes that, because Plaintiff's state law claims turn on the existence of probable cause for Plaintiff's arrest, see, e.g.. Franklin v. Consol. Gov't of Columbus, Ga., 512 S.E.2d 352, 355–56 (Ga. Ct. App. 1999), Defendant is entitled to summary judgment on the claims for the same reasons that he is entitled to summary judgment on the § 1983 claim.